**UNITED STATES COURT OF INTERNATIONAL TRADE**

| | |
|---|---|
| THAI UNION GROUP PUBLIC COMPANY ) <br> LIMITED; THAI UNION SEAFOOD ) <br> COMPANY LIMITED; AND OKEANOS FOOD ) <br> COMPANY LIMITED ) <br> ) <br> Plaintiffs, ) <br> ) <br> v. ) <br> ) <br> UNITED STATES, ) <br> ) <br> Defendant. ) <br> ) | Court No. 26-02231 |

**<u>COMPLAINT</u>**

Pursuant to Rule 3(a)(2) of the Rules of the United States Court of International Trade,

Plaintiffs, Thai Union Group Public Co., Ltd.; Thai Union Seafood Co., Ltd.; and Okeanos Food

Co., Ltd. ("Plaintiffs"), by and through their counsel, allege and state, as follows:

**<u>ADMINISTRATIVE DETERMINATION TO BE REVIEWED</u>**

1.      Plaintiffs seek review of the final determination issued by the U.S. Department of

Commerce ("Commerce") in its nineteenth administrative review of the antidumping duty

("AD") order on certain frozen warmwater shrimp from Thailand (the "*AD Order*"). The final

results of Commerce's review, which covers entries made between February 1, 2023 and January

31, 2024 (the "POR"), were published in the *Federal Register* as *Certain Frozen Warmwater*

*Shrimp From Thailand: Final Results of Antidumping Duty Administrative Review; 2023-2024*,

91 Fed. Reg. 8,182 (Dep't Commerce Feb. 20, 2026) ("*Final Results*").

2.      The factual findings and legal conclusions of the contested determination were set

out primarily in the "Issues and Decision Memorandum" accompanying the final results. *See*

*Issues and Decision Memorandum for the Final Results of the Administrative Review of the*

*Antidumping Duty Order on Certain Frozen Warmwater Shrimp from Thailand; 2023-2024*,

Case No. A-549-822 (Feb. 17, 2026) (ACCESS Barcode 4881614-02) ("IDM").

## JURISDICTION

3.      Plaintiffs bring this action pursuant to, and in accordance with, sections

516A(a)(2)(A)(i)(I) and 516A(a)(2)(B)(iii) of the Tariff Act of 1930, as amended (codified at 19

U.S.C. §§ 1516a(a)(2)(A)(i)(I) and (a)(2)(B)(iii)), contesting certain aspects of the final results of

the 2023-2024 administrative review of the antidumping duty order on *Certain Frozen*

*Warmwater Shrimp from Thailand*.  This Court has jurisdiction over this matter pursuant to 28

U.S.C. § 1581(c), which confers upon the U.S. Court of International Trade exclusive

jurisdiction to review final antidumping duty determinations issued by Commerce under 19

U.S.C. § 1516a(a)(2).

## STANDING

4.      Plaintiffs are foreign producers and exporters of subject merchandise, certain

frozen warmwater shrimp from Thailand, and therefore are interested parties within the meaning

of 19 U.S.C. § 1677(9)(A).  Plaintiffs also actively participated in the administrative review

through the submission of factual information and written argument and, thus, also are parties to

the proceeding as defined in 19 C.F.R. § 351.102(b)(29)(ii).  Plaintiffs were selected for

individual examination by Commerce as a collective mandatory respondent.  Plaintiffs

participated in the administrative review proceeding through the submission of questionnaire

responses and through the filing of factual information and legal arguments to address

substantive case issues.  Accordingly, Plaintiffs have standing to commence this action pursuant to 19 U.S.C. § 1516a(d) and 28 U.S.C. § 2631(c).

## TIMELINESS

5.      The *Final Results*, which are being challenged herein, were published in the *Federal Register* on February 20, 2026.  *See* 91 Fed. Reg. 8,182.  On March 17, 2026, Plaintiffs timely filed a Summons initiating this action within thirty days of the publication of the *Final Results*, and Plaintiffs are timely filing the Complaint today (within thirty days of the filing of the Summons).  The filing of the Summons and Complaint thus are timely in accordance with 19 U.S.C. § 1516a(a)(2)(A), 28 U.S.C. § 2636(c), and Rules 3(a)(2) and 6(a) of the Rules of the U.S. Court of International Trade.

## STANDARD OF REVIEW

6.      This Court reviews actions concerning determinations issued by Commerce brought under 19 U.S.C. § 1516a(a)(2) to determine whether they are "unsupported by substantial evidence on the record, or otherwise not in accordance with law."  19 U.S.C. § 1516a(b)(1)(B)(i).

## PROCEDURAL HISTORY

7.      On April 9, 2024, Commerce initiated the nineteenth administrative review of the antidumping duty order on Certain Frozen Warmwater Shrimp from Thailand.  *See Initiation of Antidumping and Countervailing Duty Administrative Reviews*, 89 Fed. Reg. 24,780 (Dep't Commerce Apr. 9, 2024) ("*Initiation Notice*").  Commerce's period of review ("POR") was February 1, 2023, through January 31, 2024.

8.      On May 30, 2024, Commerce issued a memorandum stating that it had selected

**Court No. 26-02231**                                                            **Complaint**

two group entities for individual examination as mandatory respondents in the 2023-2024 administrative review: (1) Thai Union Group Public Co., Ltd.; Thai Union Seafood Co., Ltd.; and Okeanos Food Co., Ltd., as well as affiliated parties Pakfood Public Co., Ltd.; Asia Pacific (Thailand) Co., Ltd.; Chaophraya Cold Storage Co., Ltd.; Okeanos Co., Ltd.; and Taksin Samut Co., Ltd. (collectively, "Thai Union"); and (2) Charoen Pokphand Foods Public Company Limited and CP Merchandising Co., Ltd. (collectively, "CP Foods").

9.      On July 16, 2024, Commerce received timely responses from Thai Union and CP Foods to section A of Commerce's antidumping duty questionnaire.

10.      On August 15, 2024, Commerce received a timely response from Thai Union to the remaining sections of the questionnaire (*i.e.*, sections B, C, and D, the sections covering home market sales, U.S. sales, and cost of production (COP)/constructed value (CV), respectively).  On the same day, CP Foods submitted a letter in which it informed Commerce that it was suspending its participation in the proceeding.

11.      On September 9, 2024, Commerce selected Thai Royal Frozen Foods Co., Ltd. ("Thai Royal") as an additional respondent for individual examination and issued the antidumping duty questionnaire to Thai Royal.  From October 10, 2024, to October 30, 2024, Thai Royal submitted timely responses to Commerce's antidumping duty questionnaire.

12.      On February 20, 2025, Commerce issued a supplemental questionnaire to Thai Union, and on February 20, 2025, and on March 21, 2025, Commerce issued supplemental questionnaires to Thai Royal.  On March 13, 2025, Commerce received Thai Union's response to the supplemental question, and on March 14 and 21, 2025, Commerce received Thai Royal's responses to the supplemental questionnaires.

13.     On May 2, 2025, Mazzetta Company, filed comments for Commerce's consideration in the preliminary results of review, and on May 9, 2025, and May 12, 2025, Commerce received rebuttal comments from the American Shrimp Processors Association ("ASPA") and the Ad Hoc Shrimp Trade Action Committee ("AHSTAC"), respectively.

14.     On June 11, 2025, Commerce published the preliminary results of its administrative review in the *Federal Register* in which it determined a preliminary dumping margin of 0.00 percent for Thai Union and 0.73 percent for Thai Royal. *See Certain Frozen Warmwater Shrimp From Thailand: Preliminary Results of Antidumping Duty Administrative Review, Rescission of Review, in Part, and Preliminary Determination of No Shipments; 2023-2024*, 90 Fed. Reg. 24,572 (Dep't Commerce June 11, 2025) ("*Preliminary Results*"). The non-selected companies under review were preliminarily assigned a weighted-average dumping margin of 0.73 percent based on the margin calculated for Thai Royal; and CP Foods was assigned a margin based on adverse facts available of 57.64 percent. *See id*.

15.     On August 5, 2025, Commerce received case briefs from Mazzetta, Thai Union, Thai Royal, AHSTAC, and ASPA.  Thai Union argued in particular that, while Commerce in the *Preliminary Results* did not grant a CEP offset to Thai Union for its U.S. Channel 3 CEP sales, Commerce should re-examine the evidence and qualitative and quantitative analyses on the record and conclude in the *Final Results* that Thai Union engaged in substantial selling activities in Thailand such that its home market sales of the foreign like product constituted a marketing stage that differed from and was far more advanced than the marketing stage at which Thai Union sold subject merchandise to the United States via Channel 3 CEP sales.  Because Thai Union made its home market and U.S. Channel 3 CEP sales at different levels of trade, but

because Commerce had no basis to determine whether the difference in levels of trade between normal value and the Channel 3 CEP sales affected price comparability, Commerce could not make a LOT adjustment, and instead should grant Thai Union a CEP offset for its Channel 3 CEP sales.

16.    On August 6, 2025, Commerce issued a Post-Preliminary Analysis in which it announced that it was making changes to it differential pricing analysis.  Specifically, Commerce explained that it no longer was using the Cohen's $d$ test as part of its differential pricing analysis and that it was replacing it with a "price difference test."  Commerce also announced that it had discontinued the use of the "mixed method" as a potential alternative comparison methodology.  As a result of Commerce's change in practice, Commerce recalculated its preliminary dumping margins and determined an estimated weighted-average dumping margin of 1.28 percent for Thai Union and 0.00 percent for Thai Royal.  Commerce determined a weighted-average dumping margin of 1.28 percent for the non-selected companies under review based on the margin calculated for Thai Union, and continued to assign CP Foods a margin of 57.64 percent based on adverse facts available.

17.    From August 14 to 22, 2025, Commerce received case and rebuttal briefs specific to the differential pricing test used in the Post-Preliminary Analysis from various parties.  Thai Union, in particular, argued that Commerce had provided no explanation or evidence to support the various percentages it adopted as part of its "price difference test," "ratio test," and meaningful difference test, and that in the final results of review, Commerce should provide the explanations and substantial evidence used to support its change in practice.  In addition, Thai Union argued that the "price difference" test applied by Commerce in the differential pricing

analysis in the Post-Preliminary Analysis did not meet the statutory requirements for using average-to-transaction comparisons because the two percent threshold of the price difference test did not provide a reasonable basis to determine if prices for comparable merchandise differed "significantly" among purchasers, regions, or time periods.  Thai Union also argued that if Commerce continued to apply the new price difference test, Commerce should modify the test to find that prices of comparable merchandise differed significantly only when prices to given purchasers, regions, or time periods differed from the weighted-average prices to all other purchases, regions, and time periods by more than 25 percent.

18.    On February 18, 2026, Commerce issued its final Issues and Decision Memorandum of the 2023-2024 administrative review.  *See Issues and Decision Memorandum for the Final Results of the Administrative Review of the Antidumping Duty Order on Certain Frozen Warmwater Shrimp from Thailand*; 2023-2024 (Feb. 17, 2026).  In the Final Results, Commerce made no changes to its new differential pricing analysis and also continued to deny Thai Union a CEP offset for its U.S. Channel 3 CEP sales.  However, based on a review of the record and comments received from interested parties, Commerce made certain other changes from the *Preliminary Results* and Post-Preliminary Analysis, and determined a weighted-average dumping margin of 2.01 percent for Thai Union and 0.00 percent for Thai Royal.  Commerce calculated a weighted-average dumping margin of 2.01 percent for the non-selected companies under review based on the margin calculated for Thai Union, and assigned CP Foods a margin of 17.38 percent based on adverse facts available.  On February 20, 2026, Commerce published its final results of review. *See Certain Frozen Warmwater Shrimp from Thailand: Final Results of Antidumping Duty Administrative Review; 2023-2024*, 91 Fed. Reg. 8,182 (Feb. 20, 2026).

## ISSUES PRESENTED BY THE ACTION AND PLAINTIFF'S STATEMENT OF CLAIMS

19.    In the following respects, and for other reasons apparent from the record of the administrative proceeding, Commerce's *Final Results* in its 2023-2024 antidumping duty administrative review are unsupported by substantial record evidence and/or are otherwise not in accordance with law.

### COUNT ONE

20.    Paragraphs 1 through 19 are incorporated herein by reference.

21.    Under 19 U.S.C. § 1677b(a)(7)(B) and 19 C.F.R. § 351.412(f), Commerce will grant a CEP offset where a respondent demonstrates that normal value is determined at a more advanced level of trade than the level of trade of CEP.  Commerce does so where the respondent demonstrates such difference through documentation "that includes both a 'qualitative' and 'quantitative' analysis" to 'find that a . . . CEP offset is warranted.'"  *See*, *e.g.*, *Wheatland Tube v. United States*, 755 F. Supp. 3d 1304, 1309-10 (Ct. Int'l Trade 2025) (citation and internal brackets omitted).

22.    Commerce's determination to deny a constructed export price ("CEP") offset to Thai Union for its U.S. Channel 3 CEP sales, despite substantial record evidence demonstrating both quantitatively and qualitatively that Thai Union performed substantially more selling activities to support its sales to home market customers than to support its sales to its U.S. affiliate, Chicken of the Sea Frozen Foods (*i.e.*, for its U.S. Channel 3 CEP sales), both in terms of number of selling activities and the intensity of the selling activities performed, was unsupported by substantial record evidence and was otherwise not in accordance with law.

## COUNT TWO

23.     Paragraphs 1 through 19 are incorporated herein by reference.

24.     The statute provides that Commerce may compare the weighted average of the normal values to the EPs or CEPs of individual transactions (the "average-to-transaction" method) rather than to the weighted average of the EPs or CEPs (the "average-to-average" method) to determine whether U.S. sales are sold at less than fair value where "there is a pattern of export prices (or constructed export prices) for comparable merchandise that differ significantly among purchasers, regions, or periods of time" and "the administering authority explains why such differences cannot be taken into account using a method described in paragraph (1)(A)(i) or (ii)." 19 U.S.C. § 1677f-l(d)(l)(B); see also 19 C.F.R. § 351.414(b)(3).

25.     In the *Preliminary Results*, Commerce used the Cohen's *d* test to perform an analysis of price differences to determine which method to use. *See Preliminary Decision Memorandum* at 10. Based on the results of the Cohen's *d* test, Commerce found a patten of price differences, and, because it determined the average-to-average method could not account for such differences, it applied the "mixed alternative method" to calculate a weighted average dumping margin of 0.00 percent for Thai Union (i.e., the average-to-transaction method was applied to U.S. sales that passed the Cohen's d test, and the average-to-average method was applied to sales that did not pass the test). *See Preliminary Decision Memorandum* at 12.

26.     On August 6, 2025, in its Post-Preliminary Analysis, Commerce applied a "modified differential pricing methodology" and discontinued use of both the Cohen's *d* test and the mixed method. *See Post-Preliminary Analysis* at 1-2. Using the new approach, and making no other changes, Commerce determined the average-to-transaction method was appropriate and

calculated a new preliminary margin for Thai Union of 1.28 percent. The use of this new approach likewise increased the cash deposit rate and assessment rate calculated for Thai Union in the *Final Results*.

27.     Commerce claimed that it applied the new approach to comply with the Federal Circuit's holding, but, as Commerce itself recognized in its request for comment on alternatives to the Cohen's *d* test, it was "not required" to make a change because the Federal Circuit's decision was "not final and conclusive." *See Alternatives to the Use of Cohen's d; Request for Comment*, 90 Fed. Reg. 21277, 21278 (May 19, 2025). Commerce's decision to suddenly use an untested new calculation methodology that was not court-approved at a late stage in the proceeding, rather than continuing to use the Cohen's *d* test or using the average-to-average method, was arbitrary and punitive to Thai Union.

28.     Commerce also discontinued the use of the "mixed method" as a potential alternative comparison methodology and reduced the threshold for applying the average-to-transaction method from 66 percent to 33 percent. *See Post-Preliminary Analysis* at 2. This is contrary to the Federal Circuit's decisions, which instruct that on remand Commerce must discontinue the use of the Cohen's *d* test under certain circumstances, and provide for the continued use of the mixed or "hybrid" method. *See Marmen*, 134 F.4th at 1348 ("On remand, Commerce may re-perform a differential pricing analysis, and that analysis may not rely on Cohen's *d* test for data sets like those here"); *Stupp*, 2025 U.S. App. LEXIS 9616 ("We vacate the judgment of the Trade Court and remand for that court to remand to Commerce, which may re-perform a differential pricing analysis without relying on Cohen's *d* . . . . On remand, Commerce has discretion to do as SeAH wishes, but it also has the opportunity, if it prefers, to

re-perform a differential pricing analysis without using Cohen's *d*, which may result in the use of the average-to-transaction comparison or a hybrid methodology").

29.     In the *Final Results*, Commerce did not provide a full explanation for the basis used in the "price difference test" used to determine whether prices differ significantly among purchasers, regions, or time periods pursuant to section 777A(d)(1)(B)(i) of the Tariff Act.  The two percent threshold used by Commerce is arbitrary, does not comport with any reasonable understanding of the term "significant," and does not indicate that prices differ significantly.

30.     Commerce indicated in the Post-Preliminary Analysis that if the weighted-average net price to a given purchaser, region, or time period falls outside of the plus or minus two percent band around the weighted-average net price to all other purchasers, regions, or time periods, then the prices to that given purchaser, region, or time period "differ significantly" and those sales to the given purchaser, region, or time period pass the price difference test.  But Commerce did not provide a reasonable explanation in the *Final Results* why it chose a "two percent" test or why a "two percent" difference in weighted-average net prices constitutes a "significant" difference within the meaning of the statute.  Commerce also did not explain why a two percent difference is significant when prices within the "base" group used as a reference (*i.e.*, the weighted-average net price to all other purchasers, regions, or time periods) may themselves vary by more than 2 percent.  Commerce also did not explain why a "one size fits all" two-percent approach is consistent with the "case by case" approach mandated by the Statement of Administrative Action; nor justify why it was reasonable to apply the same standard to different industries and different products.  *See* H.R. Doc. No. 103-316, at 842-43 (1994) ("the Administration intends that in determining whether a pattern of significant price differences

exist, *Commerce will proceed on a case-by-case basis*, because small differences may be significant for one industry or one type of product, but not for another.") (emphasis added).

31.    Additionally, Commerce reduced the threshold for the application of the A-T price comparison method to all sales to 33%.  This is inconsistent with the position taken by Commerce in *Stupp Corporation v. United States*.  5 F.4th 1341, 1533 (Fed. Cir. 2021).  There, Commerce stated that it was reasonable to apply the A-T method to all sales if it found 66% of sales were "significantly different" because "when two-thirds or more of a respondent's sales are at prices that differ significantly, then the extent of these sales is so pervasive that" the normal average to average method would not permit Commerce "to separate the effect of the sales where prices differ significantly from those where prices do not differ significantly."  Commerce also stated that when it "finds that between one third and two thirds of U.S. sales are at prices that differ significantly … the effect of this pattern can reasonably be separated from sales whose prices do not differ significantly." *Id.* at 1355.  Commerce has provided no justification in the *Final Results* for why this rationale no longer applies and why it was appropriate to apply the A-T method when it found that merely 33% of sales "differ significantly."

32.    In all these respects, Commerce's modified differential pricing methodology was arbitrary, unsupported by substantial evidence, and not in accordance with law.

**COUNT THREE**

33.    Paragraphs 1 through 19 are incorporated herein by reference.

34.    In its Post-Preliminary Analysis, to calculate importer-specific assessment rates for Thai Union, Commerce used certain programming (1) to identify the U.S. importer and (2) to assign the customer name when the importer was unknown.  This programming correctly

- 12 -

calculated in importer-specific assessment rates for the importers reported in Thai Union's U.S. sales database, consistent with longstanding and established Commerce rules and practice.

35.    But without any explanation, Commerce did not include these required lines of programming in Thai Union's *Final Results* margin calculation program.  This omission resulted in antidumping duty assessment rates being calculated on a U.S. *customer*-specific basis and not on a U.S. *importer*-specific basis.  Because the statute requires Commerce to calculate and assign *importer*-specific assessment rates, to the degree that Commerce does not correct this error as part of its ministerial error correction process, the omission of the relevant programing from the *Final Results* margin calculation program constitutes an unexplained departure from established practice and an approach that is not supported by the record evidence and is contrary to law.

## COUNT FOUR

36.    Paragraphs 1 through 19 are incorporated herein by reference.

37.    When a respondent has sales, but no production quantities of certain CONNUMs during the POR, Commerce's practice is to assign to those "sold-but-not-produced" CONNUMs the costs of the most similar CONNUM produced during the POR.  *Certain Frozen Warmwater Shrimp from India; 2023-2024*, 91 Fed. Reg. 5717 (February 9, 2026), Decision Memorandum at Comment 8 ("For these final results, we continue to assign surrogate costs to the respondents' products which were sold but not produced during the POR based on our determination of the *most similar products produced during the POR*, consistent with our long standing practice.") (emphasis added).  In the *Final Results*, Commerce used incorrect programming resulting in errors concerning the assignment of surrogate costs.  To the degree that Commerce does not correct this error as part of its ministerial error correction process, the assignment of costs to

sold-but-not-produced CONNUMs that were not based on the most similar CONNUMs produced during the POR constitutes an unexplained departure from established practice and an approach that also is not supported by the record evidence.

## DEMAND FOR JUDGMENT AND PRAYER FOR RELIEF

40.    For the reasons stated above, Plaintiffs respectfully request that the Court:

(a)    enter judgment in Plaintiffs' favor;

(b)    declare that with respect to the issues raised in this Complaint, Commerce's determinations and all related findings and conclusions are unsupported by substantial evidence on the record or are otherwise not in accordance with law;

(c)    remand these matters to Commerce for redetermination consistent with the Court's opinion, including a recalculation of Thai Union's antidumping duty margin; and

(d)    provide such other relief as the Court deems just and proper.

Respectfully submitted,

/s/ Jarrod M. Goldfeder
Jarrod M. Goldfeder
Jonathan M. Freed
Robert G. Gosselink
MacKensie R. Sugama

TRADE PACIFIC PLLC
700 Pennsylvania Avenue, SE
Suite 500
Washington, DC  20003
Tel: (202) 223-3760
Fax: (202) 223-3763
Email: jgoldfeder@tradepacificlaw.com

Dated:  March 31, 2026                    *Counsel to Thai Union Group Public Co., Ltd.;*
                                          *Thai Union Seafood Co., Ltd.; and Okeanos*
                                          *Food Co., Ltd.*

- 14 -