**UNITED STATES COURT OF INTERNATIONAL TRADE**

**BEFORE: THE HONORABLE TIMOTHY M. REIF, JUDGE**

| | |
|---|---|
| THAI UNION GROUP PUBLIC COMPANY LIMITED; THAI UNION SEAFOOD COMPANY LTD.; LIMITED; AND OKEANOS FOOD COMPANY<br><br>Plaintiffs,<br><br>and<br><br>MAZZETTA COMPANY, LLC,<br><br>Consolidated Plaintiff,<br><br>v.<br><br>UNITED STATES,<br><br>Defendant,<br><br>and<br><br>AD HOC SHRIMP TRADE ACTION COMMITTEE, AMERICAN SHRIMP PROCESSORS ASSOCIATION,<br><br>Defendant-Intervenors. | Consolidated Court No. 26-02231 |

**ORDER**

Upon consideration of the Rule 56.2 motion of Plaintiff Mazzetta Company, LLC, all responses thereto, and all other papers and proceedings herein; it is hereby

**ORDERED** that Plaintiff's Rule 56.2 Motion for Judgment on the Agency Record is granted; and it is further

**ORDERED** that the U.S. Department of Commerce's final determination set forth in *Certain Frozen Warmwater Shrimp From Thailand: Final Results of Antidumping Duty Administrative Review; 2023-2024*, 91 Fed. Reg. 8,182 (Dep't Commerce Feb. 20, 2026), is

remanded to the U.S. Department of Commerce for disposition in a manner consistent with the judgment of this Court; and it is further

**ORDERED** that the U.S. Department of Commerce reconsider its decision to base its adverse facts available decision for Thai exporter/producer respondent Charoen Pokphand Foods Public Co., Ltd. on the simple average of all of the positive (*i.e.*, non-zero) transaction-specific dumping margins calculated for the U.S. sales of Thai exporter/producer respondent Thai Union Group Public Co., Ltd.; and it is further

**ORDERED** that the U.S. Department of Commerce instead base its adverse facts available decision for Thai exporter/producer respondent Charoen Pokphand Foods Public Co., Ltd. on the weighted-average of all of the positive (*i.e.*, non-zero) transaction-specific dumping margins calculated for the U.S. sales of Thai exporter/producer respondent Thai Union Group Public Co., Ltd.

**SO ORDERED**.

Date: ____________________ By: ____________________________
New York, New York Timothy M. Reif, Judge

**UNITED STATES COURT OF INTERNATIONAL TRADE**

**BEFORE: THE HONORABLE TIMOTHY M. REIF, JUDGE**

| | | |
|---|---|---|
| THAI UNION GROUP PUBLIC COMPANY LIMITED; THAI UNION SEAFOOD COMPANY LTD.; LIMITED; AND OKEANOS FOOD COMPANY<br><br>Plaintiffs,<br>and<br><br>MAZZETTA COMPANY, LLC,<br><br>Consolidated Plaintiff,<br><br>v.<br><br>UNITED STATES,<br><br>Defendant,<br><br>and<br><br>AD HOC SHRIMP TRADE ACTION COMMITTEE, AMERICAN SHRIMP PROCESSORS ASSOCIATION,<br><br>Defendant-Intervenors. | ) | Consolidated Court No. 26-02231 |

**PLAINTIFF'S RULE 56.2 MOTION FOR**
**<u>JUDGMENT ON THE AGENCY RECORD</u>**

Pursuant to Rule 56.2 of the Rules of the U.S. Court of International Trade, Plaintiff Mazzetta Company, LLC, moves for judgment on the agency record with respect to its complaint challenging the final results of the U.S. Department of Commerce in its antidumping duty administrative review of certain frozen warmwater shrimp from Thailand. *See Certain Frozen Warmwater Shrimp From Thailand: Final Results of Antidumping Duty Administrative Review; 2023-2024*, 91 Fed. Reg. 8,182 (Dep't Commerce Feb. 20, 2026), P.R. 25 and accompanying Issues and Decision Memorandum (Dep't Commerce February 17, 2026), P.R. 26.

**Court No. 26-02231, Motion for Judgment on the Agency Record**

For the reasons explained in the accompanying Memorandum of Law in Support of Plaintiff's Rule 56.2 Motion for Judgment on the Agency Record, Plaintiff Mazzetta Company, LLC requests that this Court hold that the contested portions of Commerce's *Final Results* are unsupported by substantial evidence and otherwise are not in accordance with law. Plaintiff Mazzetta Company, LLC, therefore moves that the Court remand the Department of Commerce's *Final Results* to the agency for disposition in a manner consistent with the judgment of the Court.

Respectfully submitted,

/s/ Robert G. Gosselink

Robert G. Gosselink
Jonathan M. Freed
Jarrod M. Goldfeder
Mackensie R. Sugama

**TRADE PACIFIC PLLC**
700 Pennsylvania Avenue, SE
Suite 500
Washington, D.C. 20003
(202) 223-3760

Counsel to Plaintiff Mazzetta Co., LLC

Dated: October 13, 2026

**UNITED STATES COURT OF INTERNATIONAL TRADE**

**BEFORE: THE HONORABLE TIMOTHY M. REIF, JUDGE**

THAI UNION GROUP PUBLIC COMPANY LIMITED; THAI UNION SEAFOOD COMPANY LTD.; LIMITED; AND OKEANOS FOOD COMPANY

Plaintiffs,

and

MAZZETTA COMPANY, LLC,

Consolidated Plaintiff,

v.

UNITED STATES,

Defendant,

and

AD HOC SHRIMP TRADE ACTION COMMITTEE, AMERICAN SHRIMP PROCESSORS ASSOCIATION,

Defendant-Intervenors.

Consolidated Court No. 26-02231

**CERTIFICATE OF COMPLIANCE**

The undersigned counsel at Trade Pacific PLLC certifies that the Memorandum of Law in Support of Plaintiff's Rule 56.2 Motion for Judgment on the Agency Record, dated October 13, 2026, complies with the word-count limitation described in the Standard Chambers Procedures. The memorandum of law contains 5,063 words according to the word-count function of the word-processing software used to prepare the memorandum.

Respectfully submitted,

/s/ Robert G. Gosselink
Robert G. Gosselink

**TRADE PACIFIC PLLC**
700 Pennsylvania Ave., SE, Suite 500
Washington, D.C. 20003
(202) 223-3760

Dated: October 13, 2026

Counsel to Mazzetta Company, LLC

**UNITED STATES COURT OF INTERNATIONAL TRADE**

**BEFORE: THE HONORABLE TIMOTHY M. REIF, JUDGE**

THAI UNION GROUP PUBLIC COMPANY LIMITED; THAI UNION SEAFOOD COMPANY LTD.; LIMITED; AND OKEANOS FOOD COMPANY

Plaintiffs,

and

MAZZETTA COMPANY, LLC,

Consolidated Plaintiff,

v.

UNITED STATES,

Defendant,

and

AD HOC SHRIMP TRADE ACTION COMMITTEE, AMERICAN SHRIMP PROCESSORS ASSOCIATION,

Defendant-Intervenors.

Consolidated Court No. 26-02231

**PUBLIC VERSION**

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S RULE 56.2 MOTION FOR JUDGMENT ON THE AGENCY RECORD**

Robert G. Gosselink
Jonathan M. Freed
Jarrod M. Goldfeder
MacKensie R. Sugama

**TRADE PACIFIC PLLC**
700 Pennsylvania Avenue, SE
Suite 500
Washington, D.C. 20003
(202) 223-3760

Dated: October 13, 2026

Counsel to Mazzetta Company, LLC

# TABLE OF CONTENTS

TABLE OF CONTENTS ........ i

TABLE OF AUTHORITIES ........ ii

I. STATEMENT PURSUANT TO RULE 56.2(c) ........ 1

A. Administrative Determination Under Review ........ 1

B. Issue Presented for Review ........ 1

C. Relief Sought ........ 2

II. STATEMENT OF FACTS ........ 2

III. STANDARD OF REVIEW ........ 10

IV. COMMERCE'S METHOD TO DETERMINE CP FOODS'S AFA RATE WAS ARBITRARY, UNREASONABLE, AND UNEXPLAINED ........ 11

V. CONCLUSION ........ 15

# TABLE OF AUTHORITIES

Cases Page

*Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156 (1962) ....10

*Consol. Edison Corp. v. NLRB*, 305 U.S. 197 (1938) ....10

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins.*, 463 U.S. 29 (1983) ....10

*Universal Camera Corp. v. NLRB*, 340 U.S. 474 (1951) ....10

*F.lli De Cecco di Filippo Fara S. Martino S.p.A. v. United States*, 216 F.3d 1027 (Fed. Cir. 2000) ....12

*Nippon Steel Corp. v. United States*, 458 F.3d 1345 (Fed. Cir. 2006) ....10

*Solar World Americas, Inc. v. United States,* 962 F.3d 1351 (Fed. Cir. 2020) ....11

*Star Fruits S.N.C. v. United States*, 393 F.3d 1277 (Fed. Cir. 2005) ....11

*Suramerica de Aleaciones Laminadas, C.A. v. United States*, 44 F.3d 978 (Fed. Cir. 1994) ....10

*Wheatland Tube Co. v. United States*, 161 F.3d 1365 (Fed. Cir. 1998) ....11

*Appleton Papers Inc. v. United States*, 37 CIT 1034, 929 F.Supp.2d 1329 (2013) ....11

*Ceramica Regiomontana, S.A. v. United States*, 10 CIT 399, 405, 636 F. Supp. 961 (1986) ....11

*Dongguan Sunrise Furniture Co., Ltd. v. United States*, 931 F. Supp. 2d 1346 (Ct. Int'l Trade 2013) ....12

*Mitsubishi Heavy Indus. v. United States*, 22 CIT 541, 545, 15 F. Supp. 2d 807 (1998) ....11

*Nucor Corp. v. United States*, 32 CIT 1380, 594 F. Supp. 2d 1320 (2008) ....10

*Vicentin S.A.I.C. v. United States*, 404 F. Supp. 3d 1323 (Ct. Int'l Trade 2019) ....13

Statutes and Regulations

5 U.S.C. § 706(2)(A) ....10

19 U.S.C. § 1516a ....10, 13

19 U.S.C. § 1677e(a) ....11

19 U.S.C. § 1677e(b) ....................................................................................11, 12, 13, 14

19 U.S.C. § 1677e(c)(1) ...................................................................................9, 12, 14

19 U.S.C. § 1677e(d)(2) ...................................................................................8, 12

<u>Other Authorities</u>

*Certain Frozen Warmwater Shrimp From Thailand: Amended Final Results of Antidumping Duty Administrative Review and Final Determination of No Shipments; 2023-2024*, 91 Fed. Reg. 34603 (June 8, 2026)...............................................................................................9

*Certain Frozen Warmwater Shrimp From Thailand: Final Results of Antidumping Duty Administrative Review; 2023-2024*, 91 Fed. Reg. 8,182 (February 20, 2026) ..................... *passim*

*Certain Frozen Warmwater Shrimp From Thailand: Preliminary Results of Antidumping Duty Administrative Review, Rescission of Review, in Part, and Preliminary Determination of No Shipments; 2023-2024*, 90 Fed. Reg. 24,572 (Dep't Commerce June 11, 2025) ............................6

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S RULE 56.2 MOTION FOR JUDGMENT ON THE AGENCY RECORD**

Plaintiff, Mazzetta Company, LLC, a U.S. importer of frozen warmwater shrimp from Thailand, submits this memorandum of law in support of its motion for judgment on the agency record. As set forth below, Plaintiff urges this Court to determine based on an assessment of the law and the administrative record in this case that certain aspects of the U.S. Department of Commerce's (hereinafter, "Commerce's") final results of review are not supported by substantial evidence and are otherwise not in accordance with law, and to remand the agency's determination for further proceedings.

## I. STATEMENT PURSUANT TO RULE 56.2(c)

### A. Administrative Determination Under Review

Plaintiff Mazzetta moves for judgment on the agency record with respect to its complaint challenging certain aspects of the final results of the U.S. Department of Commerce in its antidumping duty administrative review of certain frozen warmwater shrimp from Thailand. *See Certain Frozen Warmwater Shrimp From Thailand: Final Results of Antidumping Duty Administrative Review; 2023-2024*, 91 Fed. Reg. 8,182 (Dep't Commerce Feb. 20, 2026) ("*Final Results*"), P.R. 25. The challenged determination, findings, and conclusions are set forth in Commerce's unpublished Issues and Decision Memorandum (Dep't Commerce February 17, 2026) ("*Final Decision Memorandum*"), P.R. 26.

### B. Issue Presented for Review

Plaintiff seeks judgment on the agency record and a remand of Commerce's determination with respect to one issue: whether Commerce's *Final Results* were based on substantial evidence when Commerce based its adverse facts available dumping rate for the uncooperative Thai exporter/producer respondent Charoen Pokphand Foods Public Co., Ltd.

("CP Foods") on the *simple*-average of the positive dumping duty margins calculated on the U.S. sales transactions of the cooperative Thai exporter/producer respondent Thai Union Group Public Co., Ltd. ("Thai Union"). In this case, substantial information on the administrative record establishes that a *simple* average of the dumping margins of Thai Union's dumped sales used by Commerce is an arbitrary number that has no rational relationship to the levels of dumping found in this period of review, and thus not only is an unreasonable dumping rate to apply to CP Foods, but is a rate that is not supported by substantial evidence.[1]

### C. Relief Sought

Because Commerce failed to consider the record as a whole and to determine a dumping rate to apply to CP Foods that was reasonably related to the actual levels of dumping found during this review, Commerce's *Final Results* were unsupported by substantial evidence. The Court should remand to Commerce with instructions to base its adverse facts available dumping rate for Thai exporter/producer respondent CP Foods on the *weighted*-average of the positive dumping duty margins calculated on the dumped U.S. sales transactions of Thai Union.

## II. STATEMENT OF FACTS

On April 9, 2024, Commerce initiated the nineteenth administrative review of the antidumping duty order on certain frozen warmwater shrimp from Thailand covering the period February 1, 2023, through January 31, 2024. *See Initiation of Antidumping and Countervailing Duty Administrative Reviews*, 89 Fed. Reg. 24,780 (Dep't Commerce Apr. 9, 2024) ("*Initiation Notice*"). On May 30, 2024, Commerce announced that it had selected two group entities for individual examination as mandatory respondents in the 2023-2024 administrative review. One

[1] Plaintiff Mazzetta is not pursuing Count One of its March 31, 2026, Complaint, and is limiting its challenge of Commerce's *Final Results* only to Count Two of its Complaint.

group was "Thai Union," consisting of Thai Union Group Public Co., Ltd. and its affiliates Thai Union Seafood Co., Ltd. and Okeanos Food Co., Ltd. The second group was "CP Foods," consisting of Charoen Pokphand Foods Public Company Limited and CP Merchandising Co., Ltd. *See* Memorandum Re. Certain Frozen Warmwater Shrimp from Thailand: Respondent Selection (May 30, 2024), at 1, 5, P.R. 212, C.R. 226. During the POR, Plaintiff Mazzetta was a U.S. importer of record of subject merchandise produced and exported by CP Foods.

On July 16, 2024, Commerce received timely responses from both CP Foods and Thai Union to section A of Commerce's antidumping duty questionnaire. And on August 15, 2024, Commerce received a timely response from Thai Union to the remaining sections of the questionnaire (*i.e.*, sections B, C, and D, the sections covering home market sales, U.S. sales, and cost of production (COP)/constructed value (CV), respectively). But CP Foods was having problems preparing the remainder of its questionnaire responses. On June 25, 2025, within 14 days of receiving Commerce's June 11, 2025, antidumping duty questionnaire, CP Foods requested that Commerce modify its reporting requirements. *See* CP Foods's Request for Modification of Reporting Requirements (June 25, 2025) ("CP Modification Request Letter"), P.R. 206, C.R. 225. Specifically, CP Foods requested that Commerce modify its Section B.II.B requirement that "if you sold to an affiliate that resold the merchandise to an unaffiliated party in the comparison market, report the affiliate's resales during the reporting period for comparison market sales, to unaffiliated customers rather than your sales to the affiliate." *Id.* at 2. Based on its preliminary analysis of its home market sales during the POR, CP Foods informed Commerce that its home market was viable, but that an "incredible burden would be imposed on CPF and on the Department should it require CPF's affiliates to report their home market sales to their unaffiliated customers." *Id.* Specifically, CP Foods explained that:

> Most of CPF's home market sales are made to an affiliated company, CPF Global Food Solution Public Company Limited ("CPFGS"). CPF estimates that almost [ ]% of its home market sales are made to CPFGS. CPFGS, in turn, resells the merchandise under review to affiliated and unaffiliated home market customers in Thailand. Most CPFGS sales to affiliated customers consist of sales to retailers in which CPF and its affiliates have corporate affiliations as per the Department's practice and regulations, but in which neither CPF nor its affiliates have any corporate or legal means to compel compliance with the Department's requests for information because CPF does not control the management of these companies. These companies, [ ] have almost 17,000 retail units located all throughout Thailand selling to individuals. CPF estimates that there could be millions of transactions involving merchandise under review, e,g., frozen warmwater shrimp, most involving very small quantities, during the POR. Moreover, these transactions are made with individual consumers in Thailand who are covered by the Personal Data Protection Act BE 2562 (2019) of Thailand. The Act governs the protection of individuals' privacy and data, and could impair or prevent the affiliated retailers from providing data.

*Id.* at 3. Given these circumstances, CP Foods explained further that

> should the Department apply Section B.11.B of the questionnaire strictly, CPF potentially would be required to submit over a million line item affiliated retailer transactions in the Section B database. This would be an extremely burdensome reporting obligation for CPF to meet during the regulatory deadlines of this review. CPF also has no way to compel these affiliated retailers to provide this information, and the affiliated retailers may be unable to provide this information. Moreover, the Department would also find it burdensome to analyze voluminous transactions to calculate a margin for CPF.

*Id.* at 3-4. Based on these difficulties, CP Foods requested that Commerce modify its reporting requirements, such that (1) CPF would report its sales to affiliated and unaffiliated parties; (2) CPFGS would report its sales to affiliated and unaffiliated parties; (3) should the sales to the affiliated parties fail the arm's-length test, then Commerce would disregard those sales from its calculations and rely only on sales to the unaffiliated parties; and (4) Commerce would not require CP Foods to report resales by the other affiliated parties (i.e., the affiliated retailers such as [ ], [ ] and [ ]). *Id.* at 4. Despite CP Foods's timely notification of its reporting difficulties, Commerce did not respond to CP Foods's request until more than five

weeks later after CP Foods already had submitted a complete Section A response.[2] *See* Letter from Commerce Responding to Charoen's Reporting Difficulties and Request for Modification of Reporting Requirements (August 2, 2024) ("Commerce's Response to Reporting Difficulties"), P.R. 159. Acknowledging CP Foods's notification that "the home market reporting posed an unusually burdensome task if all home market sales were included in home market sales data because CPF estimates there could be millions of transactions of merchandise under consideration during the POR and most of these transactions involved individual consumers in Thailand who are covered by the Personal Data Protection Act BE 2562 (2019) of Thailand, which could impair CPF from reporting the consumer's data to Commerce," Commerce responded that it would continue "to consider this reporting difficulty and will determine based on an analysis of CPF's home market sales database how best to ensure that Commerce will be able to conduct this administrative review in a fair and timely manner," and that in the meantime "CPF and CPFGS should report sales made to affiliated and unaffiliated parties in its section B questionnaire response as instructed in Commerce's initial questionnaire." Id. at 1-2. On August 15, 2024, CP Foods informed Commerce that, despite Commerce's accommodations, the antidumping duty questionnaire still presented CP Foods "with a crushing reporting burden that it cannot meet," and that it was suspending its participation in the proceeding. *See* CP Foods Suspension of Participation Letter (August 15, 2024), P.R. 157.

Thereafter, on September 9, 2024, Commerce selected Thai Royal Frozen Foods Co.,

---

2 CP Foods's Section A response further elaborated on the complexity of the company's home market sales and distribution channels, and confirmed that "the sales offices and warehouses of CPFGS are also located in approximately [ ]" and that "affiliated resellers purchasing from CPFGS for resale [ ] operate nearly [ ], selling to individual customers." *See* CP Foods Section A Response (July 16, 2024), at 7, P.R. 171, C.R. 204.

Ltd. ("Thai Royal") as a replacement respondent for individual examination, and issued the antidumping duty questionnaire to Thai Royal. From October 10, 2024, to October 30, 2024, Thai Royal submitted timely responses to Commerce's antidumping duty questionnaire.

On June 11, 2025, following months of numerous rounds of supplemental questionnaires issued to, and received from, respondents Thai Union and Thai Royal, Commerce published the preliminary results of its administrative review in which it determined a preliminary dumping margin of 0.00% for Thai Union and 0.73% for Thai Royal. *See Certain Frozen Warmwater Shrimp From Thailand: Preliminary Results of Antidumping Duty Administrative Review, Rescission of Review, in Part, and Preliminary Determination of No Shipments; 2023-2024*, 90 Fed. Reg. 24,572 (Dep't Commerce June 11, 2025) ("*Preliminary Results*"), P.R. 84. For the non-individually examined companies subject to review, Commerce assigned a dumping margin of 0.73% based on the weighted-average margin calculated for Thai Royal. *Id.*

With regard to CP Foods, Commerce concluded that the company had not acted to the best of its ability to comply with Commerce's request for information because it did not fully respond to Commerce's initial questionnaire and had ceased participating in the review. *See* Decision Memorandum for the Preliminary Results of the Antidumping Duty Administrative Review of Frozen Warmwater Shrimp from Thailand (June 5, 2025), at 7, P.R. 85. Commerce determined that the use of facts otherwise available with adverse inferences was appropriate, and therefore preliminarily assigned CP Foods an adverse facts available ("AFA") dumping margin of 57.64% based on the highest dumping margin alleged in the original 2004 less-than-fair-value investigation petition. *See id*. at 8. Commerce indicated that "to determine the probative value of the dumping margin of 57.64 percent," Commerce compared this rate to "the preliminary calculated individual dumping margins (i.e., margins for individual comparisons) for the

cooperating respondents in the review" and "found the rate of 57.64 percent to be within the range of the calculated individual dumping margins." *Id.*

On August 5, 2025, Commerce received case briefs from Mazzetta and other interested parties. Mazzetta argued in particular that Commerce should reconsider its assignment to CP Foods of an AFA margin, and instead should assign CP Foods a dumping margin based on neutral facts available. Alternatively, Mazzetta argued that if Commerce continued in the final results of review to use an adverse inference to determine the dumping margin for CP Foods, then Commerce should reconsider its preliminary approach, corroborate any secondary information that it used as the basis for an adverse inference to ensure it had probative value, and assign to CP Foods a more appropriate AFA dumping rate given the particular facts of this review. *See* Mazzetta Case Brief (August 5, 2025), at 10-19, P.R. 60, C.R. 40.

On August 6, 2025, Commerce issued a Post-Preliminary Analysis in which it announced that it was making changes to it differential pricing analysis. Specifically, Commerce explained that it no longer was using the Cohen's *d* test as part of its differential pricing analysis and that it was replacing it with a "price difference test." Commerce Memorandum Re. "Post-Preliminary Analysis for the Administrative Review of Certain Frozen Warmwater Shrimp from Thailand (August 6, 2025), at 2, P.R. 55. Commerce also announced that it had discontinued the use of the "mixed method" as a potential alternative comparison methodology. *Id.* As a result of Commerce's change in practice, Commerce recalculated its preliminary dumping margins and determined estimated weighted-average dumping margins of 1.28% for Thai Union and 0.00% for Thai Royal. Commerce also determined a weighted-average dumping margin of 1.28% for the non-selected companies under review based on the margin calculated for Thai Union, and continued to assign CP Foods a margin of 57.64% based on adverse facts available. *Id.* at 5.

On February 18, 2026, Commerce announced the final results of the 2023-2024 administrative review. Based on a review of the record and comments received from interested parties, Commerce made certain changes from its *Preliminary Results* and Post-Preliminary Analysis, and determined weighted-average dumping margins of 2.01% for Thai Union and 0.00% for Thai Royal. For the non-individually examined companies subject to the review, Commerce determined a weighted-average dumping margin of 2.01% based on the margin calculated for Thai Union. *See Final Results*, P.R. 25; *see also* Issues *and Decision Memorandum for the Final Results of the Administrative Review of the Antidumping Duty Order on Certain Frozen Warmwater Shrimp from Thailand*; 2023-2024 (Feb. 17, 2026), P.R. 26. And for CP Foods, Commerce "altered the adverse facts available (AFA) rate" for CP Foods from 57.64% to 17.38%. *See Final Results*, P.R. 25; *see also* Final Results Adverse Facts Available Rate Calculation for CP Foods (February 17, 2026), P.R. 21, C.R. 12. But instead of basing the AFA rate for CP Foods on the uncorroborated highest dumping rate alleged in the 2004 petition, Commerce assigned to CP Foods a final AFA dumping rate of 17.38%, which Commerce derived "by taking the *simple* average of all positive (*i.e.*, non-zero) transaction-specific dumping margins calculated for Thai Union in the proceeding." *See Final Decision Memorandum*, at 24. (emphasis added), P.R. 26. Commerce did not explain why it adopted this methodology; nor did Commerce explain why it based the AFA rate for CP Foods on a *simple* average of Thai Union's positive transaction-specific dumping margins instead of a *weighted* average. Commerce stated only that it found "it most appropriate, pursuant to section 776(d)(2), to select a rate based on information available on the record in the instant review" and that because the AFA rate assigned to CP Foods was based solely using information obtained in the course of the review, corroboration of the rate under section 776(c)(1) of the Tariff Act was not required. *See id.*

On February 20, 2026, Commerce published its final results of review. *See Certain Frozen Warmwater Shrimp from Thailand: Final Results of Antidumping Duty Administrative Review; 2023-2024*, 91 Fed. Reg. 8,182 (Feb. 20, 2026), P.R. 25. On March 2, 2026, however, Thai Union alleged that the *Final Results* contained ministerial errors. After receiving leave from the Court to consider these errors, Commerce agreed that it was necessary to correct the errors and amend the *Final Results*. *See* Antidumping Duty Administrative Review of Certain Frozen Warmwater Shrimp from Thailand: Analysis of Ministerial Error Allegations; 2023-2024 (June 2, 2026), at 1, P.R. 7. As a result of correcting the ministerial errors, Thai Union's weighted-average dumping margin *decreased* from 2.01% to 1.24%, and the dumping rate for the Thai exporters not selected for individual examination also decreased to 1.24%. *Id.* at 2; *see also Certain Frozen Warmwater Shrimp From Thailand: Amended Final Results of Antidumping Duty Administrative Review and Final Determination of No Shipments; 2023-2024*, 91 Fed. Reg. 34603 (June 8, 2026) (*Amended Final Results*), P.R. 6.

For CP Foods, Commerce again derived the AFA rate by taking the *simple* average of all of the newly revised positive (*i.e.*, non-zero) transaction-specific dumping margins calculated for Thai Union in the proceeding. *See* Amended Final Results Adverse Facts Available Rate Calculation for CP Foods (June 3, 2026), P.R. 4, C.R. 2. But instead of the AFA rate decreasing, the new simple average of the Thai Union transaction-specific dumping rates assigned to CP Foods *increased* from 17.38% to 26.66%. *Id.* Because Plaintiff Mazzetta was a U.S. importer of record of subject merchandise produced and exported by CP Foods during the POR, the final AFA rate applicable to Mazzetta's entries of subject frozen shrimp produced by, and imported from CP Foods therefore changed to 26.66%. This appeal ensued.

## III. STANDARD OF REVIEW

In reviewing a challenge to a final determination by Commerce, this Court deems the determination unlawful when it is "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i). Substantial evidence "is more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 477, 488 (1951) (*quoting Consol. Edison Corp. v. NLRB*, 305 U.S. 197, 229 (1938)). Moreover, substantial evidence is measured by the entire record, and when reviewing an agency determination, this Court evaluates whether the agency action is reasonable given the record as a whole and whether Commerce considered "whatever in the record fairly detracts from its weight," including "contradictory evidence or evidence from which conflicting inferences could be drawn." *Suramerica de Aleaciones Laminadas, C.A. v. United States*, 44 F.3d 978, 985 (Fed. Cir. 1994); *see also Universal Camera Corp.*, 340 U.S. at 488; *Nippon Steel Corp. v. United States*, 458 F.3d 1345, 1350-51 (Fed. Cir. 2006). In so doing, "the agency must examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins.*, 463 U.S. 29, 43 (1983) (*quoting Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168 (1962); *see also Nucor Corp. v. United States*, 32 CIT 1380, 594 F. Supp. 2d 1320, 1331-32 (2008).

In cases brought pursuant to 19 U.S.C. § 1516a, Commerce determinations also are subject to the default standard of the Administrative Procedure Act, which authorizes a reviewing court to "set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. 5 U.S.C.

§ 706(2)(A); *see also Solar World Americas, Inc. v. United States,* 962 F.3d 1351, 1359 n.2 (Fed. Cir. 2020). "Courts look for a reasoned analysis or explanation for an agency's decision as a way to determine whether a particular decision is arbitrary, capricious, or an abuse of discretion." *Wheatland Tube Co. v. United States*, 161 F.3d 1365, 1369 (Fed. Cir. 1998). In determining whether a statutory interpretation is reasonable, the Court considers "the express terms of the provisions at issue, the objectives of those provisions, and the objectives of the antidumping scheme as a whole." *See Mitsubishi Heavy Indus. v. United States*, 22 CIT 541, 545, 15 F. Supp. 2d 807, 813 (1998). The Court "will not allow an agency, under the guise of lawful discretion, to contravene or ignore the intent of the legislature or the guiding purpose of the statute." *Ceramica Regiomontana, S.A. v. United States*, 10 CIT 399, 405, 636 F. Supp. 961, 966 (1986), *aff'd*, 810 F.2d 1137 (Fed. Cir. 1987). Finally, Commerce abuses its discretion when its decision is "based on an erroneous interpretation of the law, on factual findings that are not supported by substantial evidence, or an unreasonable judgment in weighing relevant factors." *Appleton Papers Inc. v. United States*, 37 CIT 1034, 1037, 929 F.Supp.2d 1329, 1334 (2013) (*citing Star Fruits S.N.C. v. United States*, 393 F.3d 1277, 1281 (Fed. Cir. 2005)).

## IV. COMMERCE'S METHOD TO DETERMINE CP FOODS'S AFA RATE WAS ARBITRARY, UNREASONABLE, AND UNEXPLAINED

Sections 776(a)(1) and 776(a)(2)(A)-(D) of the Act provide that, if necessary information is not available on the record, or if an interested party: (1) withholds information requested by Commerce; (2) fails to provide such information by the deadlines for submission of the information, or in the form and manner requested; (3) significantly impedes a proceeding; or (4) provides such information, but the information cannot be verified, Commerce shall use, subject to section 782(d) of the Act, facts otherwise available in reach the applicable determination. In addition, Section 776(b) of the Act provides that, if Commerce finds that an interested party has

failed to cooperate by not acting to the best of its ability to comply with a request for information, Commerce may use an inference adverse to the interests of the party in selecting the facts otherwise available. 19 U.S.C. § 1677e(b)(1). An adverse inference "may include reliance on information derived from," *inter alia*, any information placed on the record. 19 U.S.C. § 1677e(b)(2). The purpose of the "adverse inference" provision of 19 U.S.C. § 1677e(b) is evident from the very words that Congress chose: Commerce may use an inference that is *adverse* to the interests of a noncooperating party when choosing from among the information otherwise available. *See*, *e.g.*, *F.lli De Cecco di Filippo Fara S. Martino S.p.A. v. United States*, 216 F.3d 1027, 1032 (Fed. Cir. 2000) (Commerce the authority to use an inference adverse to the interests of such party in order, for example, to deter future noncompliance).

But while Commerce has discretion in choosing what particular margin to select as AFA, Commerce's authority is not unbounded. In this case, Commerce concluded that it was "most appropriate, pursuant to section 776(d)(2), to select a rate based on information available on the record in the instant review" and that because the AFA rate assigned to CP Foods was based solely using information obtained in the course of the review, corroboration of the rate under section 776(c)(1) of the Tariff Act was not required. *See Final Decision Memorandum*, at 24. But even when Commerce does not rely on "secondary information" and relies only information obtained in the course of the review, Commerce may not select an AFA rate that is unreasonable or arbitrary. See *Dongguan Sunrise Furniture Co., Ltd. v. United States*, 931 F. Supp. 2d 1346, 1353 (Ct. Int'l Trade 2013) (the statutorily imposed corroboration requirement for secondary information in 19 U.S.C. § 1677e(c) did not grant Commerce "a carte blanche to use primary information to impose unreasonable AFA rates"). Thus, even when Commerce appropriately determines that an AFA rate is applicable, and relies on information obtained during the current

review to calculate that AFA rate, Commerce's determination still must be supported by substantial evidence on the record, meaning that the record as a whole demonstrates that the rate selected is reasonable. *See* 19 U.S.C. § 1516a(b)(1)(B)(i).

In this appeal, Plaintiff Mazzetta is not contesting Commerce's decision to assign CP Foods a dumping margin based on adverse facts available. But Commerce's selection of an AFA rate for CP Foods in this case was inconsistent with the statutory goals of accuracy and fairness, and was not based on the record as a whole. **Attachment 1** contains the calculation of the 26.66% AFA margin that Commerce assigned to CP Foods in the *Final Amended Results*. As shown in the attachment, Commerce derived the 26.66% AFA rate for CP Foods by dividing the total cumulated dumping margins of the Thai Union U.S. sales transactions that had positive dumping margins (i.e., [ ]) by the [ ] Thai Union U.S. sales transactions that had positive dumping margins (out of [ ] total Thai Union sales transactions). It is not clear that a simple averaging of "above zero" dumping margins alone to construct an AFA rate – without considering other information on the record related to those sales transactions – can be considered a derivation under 19 U.S.C. § 1677e(b)(2). But more importantly, Commerce offered no explanation of why it grouped these sales together, why it chose the formula it did, and how the rate calculated relates to levels of dumping found during the POR.

Even assuming that the statute allows Commerce to manipulate record data to construct an AFA rate, the methodology nonetheless needs to be reasonable. *See Vicentin S.A.I.C. v. United States*, 404 F. Supp. 3d 1323, 1342 (Ct. Int'l Trade 2019) (noting that even though Commerce has discretion to select a calculation methodology in a determination, that methodology must be reasonable), *aff'd* 42 F.4th 1372, 1382 (Fed. Cir. 2022). In this case, Commerce needed to explain why the grouping of Thai Union sales transactions it selected was

logical, and how any of the choices it made serve the purpose of the statute to promote accuracy and deterrence. *See* 19 U.S.C. § 1677e(b), (c). Here, even if Commerce could argue that it "derived" the AFA rate from facts on the record, Commerce failed to explain why its methodology was reasonable or how its methodology promoted accuracy.

Moreover, the arbitrary nature of Commerce's AFA rate calculation approach is illustrated by the rates resulting from Commerce's *Amended Final Results*. Specifically, whereas the final amended dumping margin for Thai Union *decreased* from 2.01% to 1.24% after Commerce corrected certain ministerial errors in the *Final Results*, the new simple average of all positive (*i.e.*, non-zero) transaction-specific dumping margins calculated for Thai Union in the proceeding *increased* from 17.38% to 26.66%. *See* Amended Final Results Adverse Facts Available Rate Calculation for CP Foods (June 3, 2026). That the final rate assigned to CP Foods moved in an direction opposite to the amended final rate for Thai Union demonstrates that Commerce's *simple*-average methodology has no internal consistency or logic, was not based on actual levels of dumping found during the POR, and resulted in a final AFA rate that was based solely on random arithmetic.

As an example of an approach of what Commerce might have adopted instead that is both reasonable and based on more of the administrative record as a whole, **Attachment 2** contains an alternative calculation of an AFA margin for CP Foods, which uses a *weighted*-average approach that takes into consideration Thai Union's sales quantities As shown in the attachment, Mazzetta has taken the same Thai Union U.S. sales transactions with positive dumping margins used by Commerce and has added the sales quantities for each sale so that a weighted-average rate based on all of Thai Union's dumped sales can be more accurately measured. Dividing the total extended (by quantity) cumulated dumping margins of the Thai Union U.S. sales transactions

that had positive dumping margins (i.e., [ ]) by the total quantity of Thai Union U.S. sales transactions that had positive dumping margins of [ ] pounds results in a weighted-average AFA rate that could be assigned to CP Foods of 11.02%. Not only does this approach take more of the administrative record as a whole into consideration and more accurately approximates actual levels of dumping found during the POR, but this method also would be consistent with the approach adopted by Commerce in the "Final Results of Remand Pursuant to Court Remand" in *Gallant Ocean (Thailand) Co., Ltd. v. United States*, Court No. 2009-1282 (CAFC April 16, 2010), where Commerce first determined the ***weighted***-average of the margins of the dumped sales for each of the three mandatory respondents and then chose the highest of those three numbers as the appropriate AFA rate. *Id.* at 9-10. It is not known why Commerce departed in this case from its previous practice because Commerce provided no explanation for its approach. But basing the AFA margin for CP Foods on the ***weighted***-average of the *dumped sales* of Thai Union would be appropriate because (1) as an adverse inference, it may be reasonable to assume that all of CP Foods' sales during the POR were dumped; (2) that CP Foods was dumping those sales at a rate at least as high as the cooperating mandatory respondent with the highest weighted-average margin based only that that cooperating respondent's (i.e., Thai Union's) dumped transactions, and (3) a weighted-average AFA rate would take into consideration the quantities of Thai Union's dumped transactions and therefore take into consideration actual levels of dumping and the record as a whole.

## V. <u>CONCLUSION</u>

Commerce's approach in this case of determining the AFA rate for CP Foods by calculating only a simple average of the positive (*i.e.*, non-zero) transaction-specific dumping margins calculated for Thai Union generates an arbitrary result, does not promote accuracy, is

not based on the complete administrative record, and is not supported by any explanation from Commerce whatsoever. In the past when Commerce adopted a similar approach, Commerce relied on a weighted average of transaction-specific dumping margins because Commerce considered it appropriate to select a rate as high as the cooperating respondent with the highest weighted-average margin and because a weighted-average rate is grounded in the actual behavior of the responding parties during the same period of time. Because Commerce provided no explanation for its methodological approach in this case for determining the AFA rate to assign to CP Foods or for its change in practice in which Commerce ignored the quantities of the Thai Union's dumped sales, Commerce's decision is not supported by record evidence and otherwise is not in accordance with the law. Unlike the simple-average approach adopted by Commerce, an approach that calculates an AFA rate for CP Foods by relying on a weighted average of Thai Union's positive transaction-specific dumping margins during the POR would promote accuracy and would not be arbitrary. For the reasons stated above, Commerce's selection of the AFA rate for CP Foods was unreasonable and unsupported by substantial evidence, and the Court should remand to Commerce for further consideration.

Respectfully submitted,

/s/ Robert G. Gosselink
Robert G. Gosselink
Jonathan M. Freed
Jarrod M. Goldfeder
MacKensie R. Sugama

**TRADE PACIFIC PLLC**
700 Pennsylvania Avenue, SE, Suite 500
Washington, D.C. 20003
(202) 223-3760

Counsel to Mazzetta Company, LLC

Dated: October 13, 2026

# Attachment 1

**PUBLIC VERSION**

**Shrimp from Thailand, Final Results of Review (AR 19)**
**A-549-822**
**AFA Calculation for Charoen Pokphand Foods Public Co., Ltd.**

**Simple Average of Transaction-Specific Margin Calculations**
**for Thai Union Group Public Co., Ltd.**

**TRANSACTION MARGINS:**

[ ]
[ ]
[ ]
[ ]
[ ]
[ ]
[ ]
[ ]
[ ]
[ ]
[ ]
[ ]
[ ]
[ ]
[ ]
[ ]
[ ]
[ ]
[ ]
[ ]
[ ]
[ ]
[ ]
[ ]
[ ]
[ ]
[ ]
[ ]
[ ]
[ ]
[ ]
[ ]
[ ]
[ ]
[ ]
[ ]
[ ]
[ ]

| | | | |
|---|---|---|---|
| **SUM OF TRANSACTION MARGINS:** | [ ] | | |
| **# OF TRANSACTIONS:** | [ ] | **SIMPLE AVERAGE:** | **26.66** |

[ ]
[ ]
[ ]
[ ]
[ ]
[ ]
[ ]
[ ]
[ ]
[ ]
[ ]
[ ]
[ ]
[ ]
[ ]
[ ]
[ ]
[ ]
[ ]
[ ]
[ ]
[ ]
[ ]
[ ]
[ ]
[ ]
[ ]
[ ]
[ ]
[ ]
[ ]
[ ]
[ ]
[ ]
[ ]
[ ]
[ ]
[ ]
[ ]
[ ]
[ ]
[ ]
[ ]
[ ]
[ ]

[ ]
[ ]
[ ]
[ ]
[ ]
[ ]
[ ]
[ ]
[ ]
[ ]
[ ]
[ ]
[ ]
[ ]
[ ]
[ ]
[ ]
[ ]
[ ]
[ ]
[ ]
[ ]
[ ]
[ ]
[ ]
[ ]
[ ]
[ ]
[ ]
[ ]
[ ]
[ ]
[ ]
[ ]
[ ]
[ ]
[ ]
[ ]
[ ]
[ ]
[ ]
[ ]
[ ]
[ ]
[ ]

[ ]
[ ]
[ ]
[ ]
[ ]
[ ]
[ ]
[ ]
[ ]
[ ]
[ ]
[ ]
[ ]
[ ]
[ ]
[ ]
[ ]
[ ]
[ ]
[ ]
[ ]
[ ]
[ ]
[ ]
[ ]
[ ]
[ ]
[ ]
[ ]
[ ]
[ ]
[ ]
[ ]
[ ]
[ ]
[ ]
[ ]
[ ]
[ ]
[ ]
[ ]
[ ]
[ ]
[ ]
[ ]

[ ]
[ ]
[ ]
[ ]
[ ]
[ ]
[ ]
[ ]
[ ]
[ ]
[ ]
[ ]
[ ]
[ ]
[ ]
[ ]
[ ]
[ ]
[ ]
[ ]
[ ]
[ ]
[ ]
[ ]
[ ]
[ ]
[ ]
[ ]
[ ]
[ ]
[ ]
[ ]
[ ]
[ ]
[ ]
[ ]
[ ]
[ ]
[ ]
[ ]
[ ]
[ ]
[ ]
[ ]
[ ]

[ ]
[ ]
[ ]
[ ]
[ ]
[ ]
[ ]
[ ]
[ ]
[ ]
[ ]
[ ]
[ ]
[ ]
[ ]
[ ]
[ ]
[ ]
[ ]
[ ]
[ ]
[ ]
[ ]
[ ]
[ ]
[ ]
[ ]
[ ]
[ ]
[ ]
[ ]
[ ]
[ ]
[ ]
[ ]
[ ]
[ ]
[ ]
[ ]
[ ]
[ ]
[ ]
[ ]
[ ]
[ ]

[ ]
[ ]
[ ]
[ ]
[ ]
[ ]
[ ]
[ ]
[ ]
[ ]
[ ]
[ ]
[ ]
[ ]
[ ]
[ ]
[ ]
[ ]
[ ]
[ ]
[ ]
[ ]
[ ]
[ ]
[ ]

# Attachment 2

**PUBLIC VERSION**

**Shrimp from Thailand, Final Results of Review (AR 19)**
**A-549-822**
**Alternative AFA Calculation for Charoen Pokphand Foods Public Co., Ltd.**

**Weighted-Average of Transaction-Specific Margin Calculations**
**for Thai Union Group Public Co., Ltd.**

| | | |
|---|---|---|
| **Sum of Extended % Margins** | [ | ] |
| **Total Quantity of Dumped Sales** | [ | ] |
| **Weighted Average AFA Dumping %** | **11.02%** | |

| Sequence Number | Sale Type | Quantity A | U.S. Net Price | Match Type | Normal Value | Unit Margin | Extended Margin | U.S. Value | % Margin B | Extended % Margin C = A * B |
|---|---|---|---|---|---|---|---|---|---|---|
| [ | | | | | | | | | | ] |
| [ | | | | | | | | | | ] |
| [ | | | | | | | | | | ] |
| [ | | | | | | | | | | ] |
| [ | | | | | | | | | | ] |
| [ | | | | | | | | | | ] |
| [ | | | | | | | | | | ] |
| [ | | | | | | | | | | ] |
| [ | | | | | | | | | | ] |
| [ | | | | | | | | | | ] |
| [ | | | | | | | | | | ] |
| [ | | | | | | | | | | ] |
| [ | | | | | | | | | | ] |
| [ | | | | | | | | | | ] |
| [ | | | | | | | | | | ] |
| [ | | | | | | | | | | ] |
| [ | | | | | | | | | | ] |
| [ | | | | | | | | | | ] |
| [ | | | | | | | | | | ] |
| [ | | | | | | | | | | ] |
| [ | | | | | | | | | | ] |
| [ | | | | | | | | | | ] |
| [ | | | | | | | | | | ] |
| [ | | | | | | | | | | ] |
| [ | | | | | | | | | | ] |
| [ | | | | | | | | | | ] |
| [ | | | | | | | | | | ] |
| [ | | | | | | | | | | ] |
| [ | | | | | | | | | | ] |
| [ | | | | | | | | | | ] |
| [ | | | | | | | | | | ] |
| [ | | | | | | | | | | ] |
| [ | | | | | | | | | | ] |
| [ | | | | | | | | | | ] |
| [ | | | | | | | | | | ] |
| [ | | | | | | | | | | ] |
| [ | | | | | | | | | | ] |
| [ | | | | | | | | | | ] |
| [ | | | | | | | | | | ] |
| [ | | | | | | | | | | ] |

[ ]
[ ]
[ ]
[ ]
[ ]
[ ]
[ ]
[ ]
[ ]
[ ]
[ ]
[ ]
[ ]
[ ]
[ ]
[ ]
[ ]
[ ]
[ ]
[ ]
[ ]
[ ]
[ ]
[ ]
[ ]
[ ]
[ ]
[ ]
[ ]
[ ]
[ ]
[ ]
[ ]
[ ]
[ ]
[ ]
[ ]
[ ]
[ ]
[ ]
[ ]
[ ]
[ ]
[ ]
[ ]
[ ]
[ ]
[ ]
[ ]
[ ]
[ ]
[ ]
[ ]
[ ]
[ ]
[ ]
[ ]
[ ]
[ ]
[ ]

[ ]
[ ]
[ ]
[ ]
[ ]
[ ]
[ ]
[ ]
[ ]
[ ]
[ ]
[ ]
[ ]
[ ]
[ ]
[ ]
[ ]
[ ]
[ ]
[ ]
[ ]
[ ]
[ ]
[ ]
[ ]
[ ]
[ ]
[ ]
[ ]
[ ]
[ ]
[ ]
[ ]
[ ]
[ ]
[ ]
[ ]
[ ]
[ ]
[ ]
[ ]
[ ]
[ ]
[ ]
[ ]
[ ]
[ ]
[ ]
[ ]
[ ]
[ ]
[ ]
[ ]
[ ]
[ ]
[ ]
[ ]
[ ]
[ ]
[ ]

[ ]
[ ]
[ ]
[ ]
[ ]
[ ]
[ ]
[ ]
[ ]
[ ]
[ ]
[ ]
[ ]
[ ]
[ ]
[ ]
[ ]
[ ]
[ ]
[ ]
[ ]
[ ]
[ ]
[ ]
[ ]
[ ]
[ ]
[ ]
[ ]
[ ]
[ ]
[ ]
[ ]
[ ]
[ ]
[ ]
[ ]
[ ]
[ ]
[ ]
[ ]
[ ]
[ ]
[ ]
[ ]
[ ]
[ ]
[ ]
[ ]
[ ]
[ ]
[ ]
[ ]
[ ]
[ ]
[ ]
[ ]
[ ]
[ ]
[ ]
[ ]

[ ]
[ ]
[ ]
[ ]
[ ]
[ ]
[ ]
[ ]
[ ]
[ ]
[ ]
[ ]
[ ]
[ ]
[ ]
[ ]
[ ]
[ ]
[ ]
[ ]
[ ]
[ ]
[ ]
[ ]
[ ]
[ ]
[ ]
[ ]
[ ]
[ ]
[ ]
[ ]
[ ]
[ ]
[ ]
[ ]
[ ]
[ ]
[ ]
[ ]
[ ]
[ ]
[ ]
[ ]
[ ]
[ ]
[ ]
[ ]
[ ]
[ ]
[ ]
[ ]
[ ]
[ ]
[ ]
[ ]
[ ]
[ ]
[ ]
[ ]

[ ]
[ ]
[ ]
[ ]
[ ]
[ ]
[ ]
[ ]

[ ]